# District Court of the Navajo Nation

Judicial District of Shiprock, New Mexico

---

**Benjamin & Juanita Hosteen, Plaintiffs,**

v.

**Suzie and Tony Tapaha, et al., Defendants.**

**Decided July 31, 1997**

---

## DECISION AND ORDER

Judge Lorene Ferguson presiding.

This case was brought before this Court as a complaint for "property damages; damage For Threatening/Slander and Application for Injunctive Relief" and a hearing was held. The Court heard testimony, reviewed the file and made the following findings:

1. The parties herein are members of one family. The Plaintiffs are Juanita and Benjamin Hosteen. Juanita is a daughter of the late Suzie Tapaha and a sister to the remaining named Defendants: Gloria Begay, Louise Tapaha, and Tony Tapaha. Benjamin is married to Juanita Hosteen. Tony lives in Red Valley, AZ; Louise lived at the time with mother, Suzie, in Cove, AZ; and Gloria lives in Shiprock, NM.

2. The Plaintiffs allege that the Defendants made repeated slanderous statements and remarks which are serious, humiliating and which impugned the reputation of the Plaintiffs.

3. The Plaintiffs allege that Tony Tapaha damaged Plaintiffs' windows, fence and surrounding area.

4. In his testimony, Benjamin Hosteen testified to the following:

A) He and his wife lived in two places: at Cove, AZ, and Shiprock, NM; and that he worked as a Civil Engineer and Technician for the Bureau of Indian Affairs Road Construction for 18 years and 3 months at the time of the testimony.

B) Mr. Hosteen testified that he and his wife, Juanita, lived at Cove, AZ since 1975 in a house they built and they have a homesite lease which was approved on January 3, 1977 for this home.

C) The home in Cove, AZ is located 2 miles North of Cove School and Juanita has a grazing permit which was issued to her in June, 1966 for that area.

D) Mr. Hosteen stated he was accused of practicing witchcraft by the late Suzie Tapaha, who was his mother-in-law and has deceased since the hearing.

E) Mr. Hosteen stated that this accusation was made to peacemaker, Harry Tome, amd that nothing was accomplished in the peacemaking process and he disagreed with what was said in the peacemaking session and that Suzie Tapaha made the statements and that Louise, Gloria and Tony did not attempt to stop their mother from making such statements. Mr. Hosteen believed Louise, Gloria

and Tony were in agreement with the mother, approving of what the mother said, although they, themselves, made no such statements.

F) Mr. Hosteen stated he was accused wrongfully and there is no truth to the accusations. Mr. Hosteen denied knowing anything about witchcraft.

G) Mr. Hosteen testified this accusation impacted his reputation. In support of this, Mr. Hosteen testified he is a member of the Native American Church and he has been a member since 1984 and that he is becoming a "medicine man."

H) Mr. Hosteen also testified that while no members of the Native American Church are permitted to engage in witchcraft, there are some who "go beyond what they learn and practice witchcraft." Mr. Hosteen said he does not practice witchcraft.

I) Mr. Hosteen further elaborated on the accusation by stating that "stories are spread around about me" and "other people are told I am hurting and killing people," including his wife's brother.

J) Mr. Hosteen further testified that Emerson Tom Tapaha was his wife's (Juanita's) younger brother who died in June, 1992; Emerson Tapaha was stabbed by a young man and he (Mr. Hosteen) was blamed for Emerson Tapaha's death by his (Mr. Hosteen's) mother-in-law, Suzie Tapaha. Mr. Hosteen further stated that Gloria, Louise, and Tony, Defendants herein, all blamed him. Mr. Hosteen testified he and his wife were blamed for Emerson Tapaha's death and they were told, "you killed your younger brother."

K) Mr. Hosteen stated he was not charged with any crime, let alone the death of Emerson Tapaha.

L) Mr. Hosteen also testified that a fence was broken down in his Cove, Arizona yard, that his home window (north bedroom window) was broken with a rock and that his cattle are being taken. While there have been no eyewitnesses to both the breaking of the fence and window, Plaintiff did produce witnesses testifying to statements of admission by Tony Tapaha.

M) The damaged fence consisted of 3 metal posts and some oak posts which remain at the premises.

N) Mr. Hosteen also stated he suffered from mental stress, fear, and loss of reputation by action of the Defendants.

O) Mr. Hosteen further testified he obtained treatment from Indian Heath Services for headaches and stress and that he had received medical care for about one (1) year and that he had seen a medical doctor about four (4) times for stress.

P) Mr. Hosteen showed documents that he was diagnosed as having hypertension and heavy headaches.

5. Nellie Tapaha also testified as follows:

A) She is married to Johnson Tapaha which also is the late Suzie Tapaha's son and brother to Juanita Hosteen.

B) Ms. Nellie Tapaha testified that Tony admitted to her that he broke the window and damaged the fence.

6. Johnson Tapaha testified as follows:

A) He is married to Nellie Tapaha and that he is the son of the late Suzie Tapaha and that Louise, Gloria, and Tony are siblings and that he was approached by Tony at "My Place Bar" in Waterflow, New Mexico at which time he asked that Tony help him fix the fence and the broken window.

B) Mr. Johnson Tapaha testified that his mother stated that Benjamin Hosteen killed Emerson and that Tony says that too, and that he (Johnson) is also accused of learning witchcraft.

C) Mr. Johnson Tapaha also testified that family differences began over "Uranium radiation money" as a result of the father's death.

7. Alfred Tapaha also testified as follows:

A) He, too, is Suzie's son and he is a brother to the other remaining defendants.

B) Mr. Alfred Tapaha testified that he is aware of Benjamin Hosteen being accused of witchcraft and that he goes to the Hosteens for food and shelter.

C) Mr. Alfred Tapaha said he is also being accused of witchcraft, of learning witchcraft and of being a skinwalker. He testified that he has heard these accusations from others and that the late Suzie Tapaha was the main one who made such accusations and everyone else "fell in line" with her.

D) Mr. Alfred Tapaha stated that he lives in Prewitt, NM and does not come out to the Shiprock area often.

8. Juanita Hosteen, wife to Benjamin Hosteen and one of the Plaintiffs in this case, testified to the following:

A) She and her husband, Benjamin, live in Shiprock, NM, and they were accused of witching, even when Emerson was still alive.

B) Mrs. Hosteen testified that her mother, the late Suzie Tapaha, accused her at her sister-in-law's house. There was no testimony as to who heard the accusations, which were made directly to Mrs. Hosteen. Juanita further testified that she visited at Gloria's (Defendant herein) house and the mother was there and she told everyone there, "Don't go to your sister's house. They practice witchcraft. Their house is not good."

C) Mrs. Hosteen testified that at the peacemaking session, Suzie made statements that "we [Juanita and Benjamin Hosteen] were skinwalkers and we ate our brother." She testified that such accusations hurt her feelings and that she was accused of killing her brother and that he was a sacrificial lamb.

D) Mrs. Hosteen further testified that Dorothy Johns, an aunt by clan, told her of the accusations and Minnie Tsosie also informed her of the accusations. Neither Dorothy John, Minnie Tsosie nor anyone else was present in court to testify.

E) Mrs. Hosteen stated that there is a long history of a bad relationship with her mother and that she hardly goes to Cove, AZ anymore.

F) Mrs. Hosteen stated that she and her husband are licensed for foster care and often serve as foster parents and that they had a foster child the past May, 1992, and that the accusations did not affect their positions as foster parents.

9. Delbert John Begay testified as follows:

A) Mr. Begay testified that he is a Native American Church medicine man and that he conducts prayers and that Benjamin Hosteen is an "apprentice" of his for five (5) years and that there is one more area Mr. Hosteen needs to learn about before he can conduct prayers on his own.

B) Mr. Begay testified that in his teachings, he does not utilize or teach witchcraft, skinwalking, etc.

C) Mr. Begay did not testify to any damage to Mr. Hosteen's character or reputation.

D) Mr. Begay did not testify that he was told that either Mr. or Mrs. Hosteen was a witch.

10. Chester Hosteen testified that Benjamin Hosteen is his brother and that they help one another and that they go to peyote ceremonies once a week at Delbert Begay's house.

11. Tony Tapaha testified to the following:

A) Mr. Tony Tapaha testified that the peacemaking session did not work. He stated that Harry Tome and Mr. Hosteen are acquaintances and they are both medicine men. He also testified that his mother made some statements and that Gloria and Louise did not say anything. The family was still grieving when they were told to go to peacemaking and they did not want to go.

B) Mr. Tony Tapaha testified that he ran into the fence, therefore, damaging it, however, he did not break the windows.

C) He testified that his mother's, the late Suzie Tapaha's, house is about 500 yards from the Hosteen's house.

D) Mr. Tony Tapaha further testified that Benjamin Hosteen was accused of taking government property and that he brought back government property, consisting of a wheelbarrow and barb wires, for which he was investigated by the Navajo Public Safety Criminal Investigation. Mr. Tony Tapaha stated that this was the reason Mr. Hosteen almost lost his job, not because he was called a witch, and that is the reason he was stressed and suffered hypertension and was under doctor's care.

12. Gloria Begay testified as follows:

A) She never said anything to the Hosteens and she lives in Shiprock, NM.

B) Ms. Gloria Begay testified that at the peacemaking session, statements by the late mother were made out of anger and Gloria and others calmed her down and that they left together. She testified that her mother was crying and became confused and that the peacemaking session became chaotic.

C) Ms. Gloria Begay testified that at the peacemaking session, the mother told the Hosteens that they killed her son. She then stated that "She [her mother] never said to us at anytime that she should not have said that."

13. Louise Begay testified as follows:

A) Ms. Louise Begay testified that she lived with her mother in her mother's house and that she and her mother were told to come to the peacemaking

session. The mother blamed the Hosteens for the death of her son.

B) Louise stated that none of the siblings, who are defendants, kept Juanita and her husband, Benjamin, from living in Cove, AZ. She stated it was up to the Hosteens.

## ISSUES

There are several issues involved in this suit. The first issue is whether Defendants have engaged in slanderous conduct by alleging that Benjamin and Juanita Hosteen engaged in witchcraft and caused the death of relatives. The second issue is whether the Defendants did in fact damage certain property of the Plaintiffs. The third issue is the Plaintiffs' Prayer for Injunctive Relief against further defamatory statements.

## DISCUSSION

In order to determine whether the Defendants are liable for slander, this Court is required to determine whether the statements made are in fact slanderous. In order to be defamatory, a publication must tend to lower the Plaintiffs in the opinion of men whose standard of opinion the Court can properly recognize, or a publication must tend to induce the public to entertain an ill opinion of harm regarding the Plaintiffs. 50 Am. Jur. 2d, *Libel and Slander* Section 1. Slander has been defined as the speaking of base and defamatory words, which tend to prejudice another person regarding his reputation, office, trade, business, or means of livelihood. *Id*. at section 3.

> To serve as the basis of an action for defamation, the language should be of such a nature as to harass the plaintiff's reputation by lowering him in the estimation of the community or deterring third persons from associating or dealing with him. If it does not, it is not actionable in such a suit, even though it is unpleasant, annoying, irksome, or subjects the Plaintiff to jests or barter, so as to affect his feelings.

> The actionability of works alleged to be *defamatory depends to a large extent on the temper of the times and the current of contemporary opinion, so that what may be actionable in one age will not be in another and vice versa. The Courts are likely, unless controlled by precedent, to decide in accordance with the general and fixed opinion of the particular locality or to the damaging effect of the charge contained in the words. Hence the decisions are apt to vary with the moral and social conditions and views of different communities.*

> The test is whether the words, taken in the sense in which they are reasonably understood under the circumstances by persons familiar with the language used, are capable of a defamatory construction.

*Id*. at section 8 (emphasis added).

## WITCHCRAFT

What is presently termed in the Navajo tribal courts as Navajo Common Law is a system of law based upon customs and traditions. These customs and traditions are grounded in the Navajo creation stories, which until recently have been passed on orally. Recountings and publications of the creation story have been a recent undertaking, primarily by non-Navajo social scientists. The creation stories slightly vary from region to region and from story teller to story teller. Some of these stories are recounted herein, specifically those dealing with the origin of witchcraft, which is a part of the creation story.[1] Thus, witchcraft has been firmly embedded in the minds and the lives of the Navajos. Problems with witchcraft have unfolded since, permeating distrust, rivalry and hostility throughout Navajo society. In general, the treatment of witchcraft crimes and accusations is often by clandestine arrangements.

Before the Long Walk to Fort Sumner in 1864, the crime of witchcraft in Navajo law was considered serious and its commission was considered deserving of "Capital Punishment" by individuals, immediate family groups and the extended countryside, and at times even by the tribe. Navajo Common Law III, Museum Notes, Museum of Northern Arizona, Flagstaff, Arizona, vol. 10, no. 12, June 1938. Since the return of the Navajos from Fort Sumner and the development of Navajo Common Law and justice prior to the establishment of Indian Courts, the punishment for witchcraft was basically the same - capital punishment by individual, immediate family group, etc. However, in some cases, when reported to Indian Department Officials there might have been a short imprisonment and injunction against further witchcraft. Finally, when Indian Courts were developed, the Courts became indifferent to the crimes of witchcraft. *Id.* at 45.

Witchcraft historically was considered heinous:

> Witchcraft is the most heinous of all Navajo crimes, for it affects the health and wealth of not only the individual or individuals, but it terrorizes the whole countryside as well. The practice, although now rare, is not as uncommon as most people believe. In recent years, employees of the Indian Services have been forced to publicly burn medicine bags of suspected witches in order to quell the wrath of the Navajos. Within the past five years, a witch was killed by a semi-educated boy, who, probably because of his education, had lost some of the superstition and terror that most Navajo have of these 'poisoners.'

---

1. In one version, First Man and First Woman were transformed from two primordial ears of corn, one white and one yellow. Upon producing five sets of twins, First Man and First Woman were sent to the east mountain. After five (5) days sojourn, First Man and First Woman returned, having acquired knowledge of good and bad. They also brought back the secrets of witchcraft, over which they took control.

In another version, First Man and First Woman came up through the earth, Water came up right behind them. First Man said, "We forgot something underneath." First woman said, "What is it, my husband." "It is medicine [ant'i' - evil medicine...]. We left it down there," he replied. "Well we shouldn't do that," said the woman. They could not stay without it. They had to make it some way so that it could be brought up by something. Kluckhohn, C., *Navajo Witchcraft*, Beacon Press, 1944.

> From the very beginning, the government records are filled with the difficulties of the agent in handling the problem of witchcraft. In 1882, Major Dan Riordan, then at Fort Defiance, by a hasty trip and by making dire threats, at Klageto saved the lives of four men accused of being witches. In 1912, Agent Piquet reported to the Commissioner of Indian Affairs the arrest of a Navajo charged with killing a medicine man whom the Navajo suspected of witchcraft.
>
> Usually the suspected witch is a medicine man who is attempting to gain wealth by blackmail; in other cases individuals with warped minds have been known to be accused of the practice. Sometimes individuals will charge other persons of witchcraft if they have a grievance against them....
>
> Should a witch publicly admit his crime (they sometimes did), or even be strongly suspected on circumstantial evidence, the punishment sanctioned by the Countryside is death. The kinsmen of the witch will not demand blood money. It is further believed that undetected witches eventually will be struck by lightening.

*Id.* Richard Van Valkenburgh also wrote in Museum notes, Museum of Northern Arizona, Vol. 9, No. 10, April 1937, the following:

> [I]n the minds of many thousands of Navajos, many of the crimes and offenses outlined in these regulations [Law and Order Regulations as drafted by U.S. Indian Service, Department of the Interior] are not applicable in all cases to the Navajo as a people, but by them are considered purely as domestic, personal, or group problems, that can be much more simply adjusted by those individuals involved, if there is no outside interference.

*Id.* at 51.

While witchcraft is still a subject with which many Navajos are preoccupied, it is not as publicly dealt with as perhaps in the past. This is not to say that witchcraft no longer exists in the minds and lives of the Navajo people. As indicated by Mr. Van Valkenburgh, this may have become a matter which is "purely domestic, personal, or [considered] a group problem, that can be much more simply adjusted by these individuals involved." Accusations of witchcraft were considered a means of social control or a means to slow processes that were not trusted. Shepardson, Navajo Ways in Government, a Study in Political Process, Memoir 96, Vol. 65, No. 3, Part 2, June 1963, pp. 70 and 117.

## JUDICIAL NOTICE OF WITCHCRAFT

Customs and traditional law are to be given judicial notice. *In re Estate of Benally*, 5 Nav. R. 174 (1987). Furthermore, in *In re Estate of Belone*, 5 Nav. R. 161, 165-66 (1987), the Navajo Supreme Court stated:

> [I]f a district court takes judicial notice of a particular custom as Navajo common law, it must clearly set forth in its order the custom on which it is relying, so that the basis for its decision is clear and can be reviewed by this Court.
>
> Navajo custom and traditions may be shown in several ways: it may be shown through recorded opinions and decisions of the Navajo courts or through *learned treatises on the Navajo way*; it may be judicially noticed....

*Id.* at 165 (emphasis added). As such, this Court takes judicial notice that witchcraft exists in Navajo society.

## DEFAMATION

The Navajo Courts are limited in case law regarding defamation. One of the few Navajo cases dealing with defamation is *Chavez v. Tome*, 5 Nav. R. 183 (1987). In *Chavez*, the Navajo Supreme Court addressed defamation in terms of freedom of the press.

> The United States Supreme Court has held that compelling a newspaper to print that which 'reasons' tell them not to publish is an unconstitutional violation of the First Amendment's guarantee of Freedom of the Press. Similarly, the Navajo Bills of Rights, 1 NTC section 1 (1986 Amendment), and the Indian Civil Rights Act, 25 USC section 1302 (1) (1968), guarantee the rights of the press to be free of governmental intervention.

*Id.* at 190, citing *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 41 L. Ed. 2d 730 (1974).

Likewise in *Keeswood v. Navajo Tribe*, 1 Nav. R. 362, 369-370 (Shiprock Dist. Ct. 1978), the court stated:

> The Court cannot stress [enough] the sacredness of free speech and assembly nor the rights protected under the Navajo Bills of Rights, the 1968 Indian Civil Rights Act, and the United States Constitution and how essential it is to a free government. Understandably there are narrow limits placed on these rights to say that these rights are not necessarily absolute. The sovereign may restrict these rights in the legitimate interest of protecting and insuring the public peace, property rights and functions of government when these interests of government are threatened.

The court in *Keeswood* was concerned with the people's right to freedom of communication which is to be given the most liberal and comprehensive construction so to protect the First Amendment Rights of the people.

The ability to speak (the Navajo language) is a gift bestowed upon the Navajos by the holy beings as the holy language of white shell '*saad,*' turquoise '*saad,*' abalone '*saad,*' and jet '*saad.*' '*Saad*' is creative thinking, planning, and debating.[2] In Navajo society, communication is essential to life, it is the basis of *k'e*,

---

2. "Language, perhaps the most intricate phase of culture, by its nature symbolical, but in addition to the expected linguistic symbolism, there is a ritualistic symbolism, like that of color, direction, and

relationships and respect. Thus, while on one hand *saad* is sacred, on the other hand *saad* is the basis of teaching, which includes ridicule.[3]

Here, in order for a statement to be categorized as defamatory, the statement would have to harm the Plaintiff by lowering him in the opinion of the community or by deterring a third person from associating or dealing with him. In addition, this statement must be made to an unprivileged third person, as well as be false in order to be actionable. Furthermore, in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), the United States Supreme Court held that the Constitution of the United States does not permit public officials to maintain an action in defamation, unless he proves that the defendant had knowledge of the falsity of the communication or acted in reckless disregard of its truth or falsity.

This restriction stems from the First Amendment to the United States Constitution, prohibiting any law abridging the freedom of speech and the freedom of the press. The Fourteenth Amendment incorporates this restriction as against any state law. It follows that the Indian Civil Rights Act and the Navajo Bill of Rights would incorporate such a restriction here. As such, public officials are not protected as are private individuals. Regarding the other restrictions, subsequent Supreme Court cases have amended the knowledge or reckless disregard rule to candidates for public office and other public figures. *Gertz v. Robert Welsch, Inc.*, 418 U.S. 323 (1974).

## AS TO BENJAMIN HOSTEEN

When a person becomes an apprentice or becomes a medicine man or takes up the practice of becoming a ceremonial practitioner, he/she runs the risk of being suspected of using knowledge for bad ends, or witchcraft. Shepardson, *Navajo Ways in Government*, p. 52. Thus, such accusations can be used as a means of control. This risk comes with the trade, so to speak. Medicine practitioners or apprentices heed care lest they be accused of witchcraft. The ceremonial practitioner or apprentice who was obligated to perform or learn his ritual ran the risk of being suspected of using his knowledge for bad ends. *Id.*

The ceremonial practitioners are public figures of general fame or notoriety in the community and have pervasive involvement in the affairs of the society. Such

---

number. Speech, as one of man's faculties, references in prayer to the 'tip of the speech,' the existence of the word from the very beginning of conceivable time, the requirement that prayer and song be accurately reproduced in spite of stringent restrictions and a strain on the memory.... The painted symbol of a prayer with its word is further proof of Navajo recognition of the power of the word." Richard, *Navajo Religion*, 267.

3. Navajo free speech is sacred. As earlier discussed, Navajo customs and traditions stem from the creation story which was orally handed down. *Jini'* (it is said) is the basis of the creation story, implying a story told formerly by others. Each Navajo individual thus has a right to develop his/her skills to repeat the story, thus the variations. The creation stories were built upon 'scandals' and what may be called 'gossip' today. They survived and formed the basis of Navajo teachings. Ridiculing a wrong doer is a form of control and discipline. "If you are not careful, people will be saying that about you."

pervasive fame or notoriety makes them public figures for all purposes and in all contexts. The United States Supreme Court has drawn a distinction between the public figure of general fame or notoriety in the community, who has pervasive involvement in the affairs of the society, and the person who voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In the latter description, the issues are public and engage the public's attention in regard to them, as well as assume special prominence in their resolution.

Shepardson made the following observation:

> Some sings attracted participants from other communities, and as many as a thousand people might gather for one of the more important ceremonies. A singer's influence would extend beyond the ceremonial occasion only if he was endowed with the personal qualities that inspire respect, the qualities associated with a *nataanii*.

*Id*. at 50.

Given this, the Navajo practitioner or apprentice is a public figure. And as such, is not permitted to maintain an action of defamation, unless the person who makes the defamatory statement regarding the practictioner's conduct, fitness or role knows that the statement is false and that it defames the person or if the person making the statement acts in reckless disregard of the matters.

Thus, the next question is whether the late Suzie Tapaha knew that her statement was false and whether such statement defamed the Plaintiffs, or whether the late Suzie Tapaha acted in reckless disregard of these matters. Suzie Tapaha was a traditional Navajo woman over 60 years of age. Ms. Tapaha was raised such that she was subjected to traditional teachings and beliefs. Some of these beliefs likely included the existence of witchcraft. Ms. Tapaha made statements which she never retracted. Nor did she indicate to anyone that she should not have made them. Thus, this Court is satisfied that the late Suzie Tapaha did not know her statements to be false or in reckless disregard.

In Torts 2d, Restatement of the Law 2nd, Pamphlet 3 (1976), it states that reckless disregard exists when there is a high degree of awareness of probable falseness of the statement, or where there is serious doubt as to its truth. Again, Navajo witchcraft is a means of control which exists in the Navajo society. A person asserting witchery cannot be said to lack serious doubts as to its truth or that he lacks a high degree of awareness of probable falseness. The Navajo people have a rich history based on the balance of good and bad. Witchery was part of the bad state which existed in the past and exists to this day.

Finally, even if the late Suzie Tapaha had knowledge that her statement was false or if she acted in reckless disregard, we must still address the issue whether her statements in fact defamed Mr. Hosteen. Testimony indicates that Mr. Hosteen did not lose his job because he was called a witch. Nor did he lose his license as a foster parent for these reasons. Furthermore, he was not denied the right further to practice in ceremonies under apprenticeship of Mr. Delbert John

Begay. Nor did Mr. Hosteen make any showing that he was prevented from performing ceremonies or to participate in the Native American Church because of such accusations.

Mr. Hosteen testified that he suffered from stress, hypertension and that he was suspended from his job for a period. While Mr. Hosteen testified that this stressful state was caused by having been called a witch, no witnesses were produced to validate his testimony. Furthermore, this testimony was contradicted by Tony Tapaha who testified that Mr. Hosteen was taking government property and that this was reported to the government and investigated. Mr. Tapaha testified that Mr. Hosteen's stress, medication and doctor's care were the result of his pilfering and thievery. This stress further resulted in Mr. Hosteen's state of health and hypertension tendencies. Thus, this Court is not convinced that Mr. Hosteen suffered stress and emotional upheaval as a result of Mrs. Tapaha's statements, but rather from the pilfering and thievery he was accused of engaging in.

Given the cultural practices and beliefs of the Navajo and the rights of Mr. Hosteen as a public figure, this Court does not find that Mr. Hosteen was defamed. This finding is consistent with Mr. Van Valkenburgh's observation that such matters should be considered purely as domestic, personal, or group problems, that can be more simply adjusted by those individuals involved; particularly, if the accusers are family members.

## AS TO JUANITA HOSTEEN

Here, Juanita alleges that the late Suzie Tapaha has falsely accused her of witchcraft. Juanita Hosteen is not a ceremonial practitioner. She is Benjamin Hosteen's wife. Mr. Benjamin Hosteen is a ceremonial practitioner or an apprentice and thereby a public figure and he is subjected to witchcraft accusations. The court will not go into whether Juanita Hosteen is a public figure as a wife to a Navajo medicine apprentice. Nonetheless, the Court is not convinced that Juanita was defamed.

To constitute a publication, the defamatory matter must have been communicated to someone other than the person defamed. There is a rule in which defamatory statements are not actionable if it is not published to a third person. The mother, the late Suzie Tapaha, was said to have made statements in front of some of her children, some of whom are also named defendants. As to Juanita, there was testimony that the statements were made to other Defendants. As to Benjamin Hosteen, they were made to the Defendants and sons of Suzie who are not defendants.

Mrs. Hosteen did testify that two third persons informed her that such accusations were made, but Mrs. Hosteen did not produce them as witnesses. This Court considered Mrs. Hosteen's testimony regarding such documents as hearsay. Furthermore, Mrs. Hosteen testified that the statements made by Suzie were made in her presence and not to another person. Even if they were published to third persons, outside the defendant family members, we must still

address the issue of whether such statements harmed her. *See* infra, Conditional Privilege, 12.

In order to prove defamation, Juanita Hosteen would have to show that either a statement was made which harmed her reputation, lowering her in the estimation of the community, or that such statements deterred a third person from associating or dealing with her. There has been no testimony to support such criteria. Thus, while these statements of a defamatory nature may have been published, this Court is not convinced that Mrs. Hosteen was harmed.

### STATEMENT MADE AT A PEACEMAKING SESSION

Statements made in the Peacemaking session are privileged and are not actionable. In Torts 2d, Restatement of the Law 2nd, Pamphlet 3, ch. 25 section 587, it states:

> A party to a private litigation or a private prosecutor or defendant in a criminal prosecution is absolutely privileged to publish defamatory matter concerning another in communication preliminary to a proposed judicial proceeding, or in the institution of or during the course and as a part of, a judicial proceeding in which he participates, if the matter has some relation to the proceeding.

Thus, statements made in the peacemaking session are not actionable. This Court, given the testimony, is not satisfied that Juanita's character or reputation was harmed.

### CONDITIONAL PRIVILEGE

Finally, this Court, having explored whether there is conditional privilege in this matter, is convinced that the statements made by the late Suzie Tapaha were made in front of members of her immediate family, sons, daughters, sons/daughter in-laws, to protect them from some looming harm. Conditional privilege is a defense to an action for defamation. Here, the persons to whom publication was made are close family relations. Tort 2d, Restatement 2nd, ch. 25, section 597 states that there is:

> (1) An occasion which makes a publication privileged if the circumstances induce a covert or reasonable belief that:
>
> (a) There is information that affects the well-being of a member of the immediate family of the publisher; and
>
> (b) The recipient's knowledge of the defamatory matter will be of service in the lawful protection of the well-being of the member of the family.

Here, all publications by the late Suzie Tapaha were made to her sons and daughters. Furthermore, one statement in particular appears to have been made

to heed caution. "Don't go to your sister's house. They practice witchcraft. Their house is no good." This statement was made at a small gathering of the late Suzie Tapaha and her daughters upon Emerson Tapaha's death. Similar statements were made in situations prompted by the knowledge of Emerson's death.

This Court is satisfied that there is a conditional privilege defense here as to Benjamin and Juanita Hosteen. Thus, no action for defamation will lie for Benjamin or Juanita Hosteen.

## PROPERTY DAMAGE

Mr. Hosteen testified that his fence was broken down and that his north bedroom window was broken and that his cattle were being taken. He stated that Tony Tapaha was responsible.

Tony Tapaha admitted bumping into the fence. It is not clear whether the fence was repaired. If it is not repaired, Mr. Tapaha is to make repairs. There was no testimony showing that the three (3) metal posts or the oak posts were stolen. As far as we are told, the posts are still on the premises. Thus, Mr. Tapaha shall repair the fence at his own expense. This is to be completed in 30 days. Further, Mr. Tapaha is to pay the cost regarding the window. This Court is satisfied that Tony admitted to relatives that he broke the window. He is to pay $126.49, as costs submitted by Mr. Hosteen, plus labor costs of $100.00 to replace the window. This Court will not consider the cattle alleged to have been taken as no testimony regarding such was offered.

## INJUNCTIVE RELIEF

Mr. Hosteen also requested injunctive relief against further defamatory statements. Here, this Court heard testimonies as to Mrs. Tapaha's statements. This Court is satisfied that statements were not made by any Defendants other than the late Mrs. Suzie Tapaha. Mrs. Suzie Tapaha is deceased. Thus, this Court sees no need to address the injunctive relief as requested by the Plaintiffs. This Court finds that there is no need to enjoin the remaining Defendants.

IT IS HEREBY ORDERED that Mr. Tapaha pay Mr. Benjamin Hosteen $226.49 and repair the broken fence within 30 days.